## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

MILTON RODRIGUEZ,

                **Plaintiff,**

-vs-                                         **Case No.  6:05-cv-902-Orl-JGG**

COMMISSIONER OF SOCIAL
SECURITY,

                **Defendant.**

_____

## MEMORANDUM OF DECISION

Plaintiff Milton Rodriguez ["Rodriguez"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying Rodriguez's application for disability insurance benefits. *See* Docket No. 1 (complaint). For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

### I.    PROCEDURAL HISTORY

On October 9, 2002, Rodriguez filed a claim for disability insurance benefits, claiming disability as of January 30, 2002. R. 53. On October 5, 2004, the Honorable Apolo Garcia, Administrative Law Judge ["ALJ"], held a 53-minute hearing on Rodriguez's claim in Orlando, Florida. R. 314 - 353. Attorney Maria Santana represented Rodriguez at the hearing. R. 314. The ALJ heard testimony from Rodriguez and his wife.

On January 6, 2005, the ALJ issued a decision that Rodriguez was not disabled and not entitled to benefits. R. 10-20A. Following a review of the medical and other record evidence, the ALJ found

that Rodriguez could not perform his past relevant work as a shipping and receiving clerk and stock room clerk.  R. 14; 20, Finding 7.  The ALJ found that Rodriguez nevertheless retained the residual functional capacity ["RFC"] to perform substantially all of the full range of the physical exertional requirements of light work.  R. 20, Finding 11.  Applying the Medical-Vocational Guidelines ("the grids"), the ALJ concluded that Rodriguez was not disabled.[1]  R. 20, Finding 12.

After considering additional medical records, R. 8, 313, the Appeals Council denied review on April 22, 2005.  R. 5-7.  On June 16, 2005, Rodriguez timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1.  On February 1, 2006, Rodriguez filed in this Court a memorandum of law in support of his appeal.  Docket No. 20.  On April 3, 2006, the Commissioner filed a memorandum in support of her decision that Rodriguez was not disabled. Docket No. 21.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Rodriguez assigns three errors to the Commissioner.  First, Rodriguez claims that the Commissioner erred in determining he had the RFC to perform a full range of light work when his treating physician opined that he was unable to work.  Second, he claims that the Commissioner erred by failing to obtain testimony from a vocational expert and relying on the grids to determine Rodriguez was not disabled.  Third, Rodriguez claims that the Commissioner erred in evaluating his complaints of pain.

---

[1]The Social Security ALJs face a herculean task.  The Commissioner now expects ALJs to hear and decide 50 to 55 decisions per month according to a former Chief ALJ in a July 2005 presentation at a Federal Judicial Center workshop on disability appeals.  With only the help of non-attorney decision-writers and staff attorneys, the ALJs must rapidly process a monumental backlog of thousands of complex, aging cases.  The effects are felt in the district court. According to the AOUSC, the Middle District of Florida has the third highest volume of disability appeals in the nation.  Each magistrate judge in the Orlando Division, for example, resolves approximately fifty-three appeals every year — an average of about one per week.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that the ALJ properly evaluated the medical evidence. Docket No. 21 at 3. Second, the Commissioner argues that the ALJ properly relied on the grids to determine disability. Docket No. 21 at 12. Third, the Commissioner argues that the ALJ properly considered Rodriguez's testimony regarding his subjective complaints. Docket No. 21 at 15.

## III.    THE STANDARD OF REVIEW

### A.    AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of

factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.     REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.     REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the

district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).   On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

### D.    STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE

After the ALJ's decision — but before the Appeals Council decision — Rodriguez submitted a letter from his treating physician dated February 10, 2005, which stated he has been treating Rodriguez "for many years."[3]  R. 313.  If a claimant submits evidence that does not relate to the

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

[3]Other records in contained in the administrative record reveal that treatment was provided from November 30, 1995, through June 9, 2003.  R. 100-26.

relevant period under consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file a new application."  20 C.F.R. § 404.976(b)(1)(2005).  The Appeals Council did not return the additional evidence to the claimant.  Rather, the Appeals Council properly made the evidence a part of the record, and also considered the evidence in denying review. R. 5, 8.  The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g).  The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad. *Sims v. Apfel*, 530

U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary responsibility for identifying and developing the issues.  *Sims*, 120 S.Ct. at 2086.  When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review.  20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086;  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review.  *Keeton*, 21 F.3d at 1066.  Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council.  *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision.  *Sims*, 120 S.Ct. at 2086; *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998).  When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence.  *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).  The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review.  *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005); *Williams*, 407 F. Supp. 2d at 1303.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies. When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error. *Sims*, 120 S.Ct. at 2086; *Keeton*, 21 F.3d at 1066. Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error. *See Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record). The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies. The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's findings are supported by substantial evidence. The Appeals Council's determination is subject to

judicial review.  The Commissioner cannot avoid judicial review of the Appeals Council's final

decision by passing a regulation defining the term "final decision of the Commissioner of Social

Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final

decision a "denial of review." *See Sims*, 120 S.Ct. at 2086;  *accord, Bloodsworth v. Heckler*, 703 F.2d

1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final

decision under 42 U.S.C. § 405(g)); *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the

claimant unable to do his or her previous work, or any other substantial gainful activity which exists

in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438

(11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner

also has a duty to notify a claimant of the statutory right to retained counsel at the social security

hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662

F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the

right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d

at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

**B.    THE FIVE STEP EVALUATION**

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled. 20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.

-11-

42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the

physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.   TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion

on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.   PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and

-16-

laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

### F. CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination

-17-

is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — *i.e.*, limitations in functional

-18-

areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Some individuals may actually have worked during the period of time pertinent

to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional

restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

## V.   <u>APPLICATION AND ANALYSIS</u>

### A.   THE FACTS

Rodriguez was born on January 5, 1963, and was 42 years old when the ALJ issued his decision. R. 14, 53.  Rodriguez did not graduate from high school or obtain a GED.  R. 319.  Prior to the alleged onset of disability, Rodriguez had been employed as a stock room clerk and a shipping and receiving clerk.  R. 68.  Both of these jobs required him to frequently lift 25 pounds, and occasionally up to 40 pounds, and to be on his feet for approximately six hours a day.  *Id.*

Approximately in 1987,[4] Rodriguez sustained a head injury when he fell and hit his head on a cement street.  R. 53, 162.  He underwent surgery the day after his injury to control the bleeding in his head and, in approximately 1990, began experiencing seizures.  R. 162.  Additionally, on December 30, 2001, Rodriguez was diagnosed with Hepatitis C.  R. 146.

On November 30, 1995, Rodriguez began treatment for his seizures with Dr. Sampathkumar Shanmugham, a board certified neurologist.  R. 125-26.  Five days earlier, Rodriguez had been taken

---

[4] The date is calculated based on Rodriguez's birth date and that he was 24 years old at the time of the injury.

to the emergency room after having a seizure.  Rodriguez reported that he had forgotten to take his medication and had been drinking 6-7 beers a day.  R. 125.  The emergency room doctor noted that Rodriguez had a history of coming to the emergency room due to seizures caused by alcohol binging. *Id*.  Rodriguez informed Dr. Shanmugham that his seizures were controlled by medication except when he drinks alcohol.  R. 126.  Dr. Shanmugham conducted a complete neurological examination which was significant only for lateral gaze nystagmus bilaterally.  R. 125.  The diagnosis was partial complex seizures, and Dr. Shanmugham suspected that Rodriguez's seizures were caused by the alcohol lowering his seizure threshold.  R. 126.  Dr. Shanmugham advised Rodriguez to stop drinking immediately and to join Alcoholics Anonymous.  *Id*.  If Rodriguez abstained from alcohol for three months and took his medication, Dr. Shanmugham would then be able to assess the effectiveness of his current medication.  *Id*.

Rodriguez next saw Dr. Shanmugham on April 2, 1996.  R. 124.  Rodriguez had been drinking steadily since his last visit and had not joined A.A.  *Id*.  Rodriguez's neurological exam was within normal limits.  *Id*.  Dr. Shanmugham stated he could not do anything to control the seizures while Rodriguez drank.  *Id*.  At a follow up visit three months later, Dr. Shanmugham noted that Rodriguez had not made any effort to stop drinking.  R. 123.

On October 7, 1996, Rodriguez saw Dr. Shanmugham for a follow up.  R. 122.  Although he had not stopped drinking entirely, he was limiting his drinking to Fridays and Saturdays, and claimed to be doing well.  *Id*.  Dr. Shanmugham noted that Rodriguez was "still performing light duty."  *Id*.  Dr. Shanmugham again advised Rodriguez to stop drinking and to join A.A.  *Id*.  Subsequent treatment notes from March 6, 1997, through October 4, 1999, reflect that, although Rodriguez may

-23-

stop drinking for a brief period of time, Rodriguez continued to drink alcohol and have seizures.  R. 108-118, 120-21.

On June 4, 1999, Rodriguez complained to Dr. Shanmugham of frequent shoulder dislocation. R. 112.  He was advised to see an orthopedic surgeon.  *Id*.  On September 17, 1999, he again complained to Dr. Shanmugham about right shoulder pain and tenderness.  R. 109-10. Dr. Shanmugham gave him a 12-day trial of medication with plans to refer him to an orthopedic surgeon if there was no improvement.  R. 110.

On July 24, 2000, Dr. Shanmugham stated Rodriguez's last seizure was in May 2000, but provided him with a note restricting his work duties for a six month period to exclude any lifting or moving.  R. 105.  The doctor also indicated that if Rodriguez remained seizure free to six months, he may be able to return to full duties.  *Id.*

On July 11, 2002, Rodriguez again saw Dr. Shanmugham, and indicated that he "might have had" a few seizures since his last visit.  R. 104.  He was not actively looking for work, and stated that he "still" suffered from poor memory.  *Id.*  The cranial exam was normal.  Muscle strength was normal in all four extremities.  Gait was normal.  Finger-to-nose and heel-to-shin exam did not show any ataxia.  Deep tendon reflexes were 2+ and symmetrical.  Plantar response was flexor bilaterally.  *Id*. During the evaluation, Dr. Shanmugham noted that Rodriguez's remote memory was good, but that his recent memory was impaired.  *Id*.  Dr. Shanmugham opined that Rodriguez was suffering mild memory impairment related to his Lamictal therapy.  *Id*.  Rodriguez was still drinking alcohol.  *Id*.

Thereafter, on October 24, 2002, Dr. Shanmugham noted again that Rodriguez had poor recent memory, and his wife had to remind him of various things that he did as he had no recollection of

-24-

them. R. 103. During the mental status of this examination, Rodriguez was only able to remember one out of three items. *Id.* Dr. Shanmugham still considered Rodriguez memory impairment to be mild and did not see a reason to change his medication at that time. *Id.* The cranial exam was normal. Muscle strength was normal in all four extremities. Gait was normal. Finger-to-nose and heel-to-shin exam did not show any ataxia. Deep tendon reflexes were 2+ and symmetrical. Plantar response was flexor bilaterally. *Id.* Rodriguez was still drinking alcohol. *Id.*

On December 17, 2002, Dr. Shanmugham completed a disability form in which he stated that Rodriguez's seizures, and his seizure medication, affect his motor abilities. R. 184. Dr. Shanmugham did not quantify the motor deficits in degrees or the extent in which it has resulted in a sustained disturbance of gait, station and/or fine or gross movement. *Id.*

At the following visit, on February 6, 2003, Rodriguez stated that since his last visit, he had three seizures during his sleep. R. 101. Dr. Shanmugham noted that Rodriguez's recent memory was poor, which the doctor considered to be a mild impairment. R. 101-02. Dr. Shanmugham indicated that during the mental status examination, Mr. Rodriguez was unable to remember any items told to him. *Id.* The cranial exam was normal. Muscle strength was normal in all four extremities. Gait was normal. Finger-to-nose and heel-to-shin exam did not show any ataxia. Deep tendon reflexes were 2+ and symmetrical. Plantar response was flexor bilaterally. *Id.* Dr. Shanmugham offered to increase the Lamictal, but Rodriguez was uninterested. *Id.*

On January 20, 2003, the State agency sent Rodriguez to Rosimeri Clements, Psy.D. for a general clinical evaluation with mental status and abbreviated neuropsychological screening. R. 185-188. Rodriguez claimed that his memory difficulties were due to the seizures and that he was

experiencing Grand mal seizures.  R. 185.  Rodriguez denied short-term memory difficulties and claimed long-term memory problems.  *Id.*  Dr. Clements observed that Rodriguez had good recall of personal events and remote events.  R. 186.  When Dr. Clements administered the abbreviated neurological testing, however, she noted that  Rodriguez "often struggled with the test" and that he "could not recall information and at times would provide nonsense responses and embellish information."  R. 187.

Dr. Clements administered the Wechsler Memory Scale (WMS-III).  *Id.*  The test results revealed that Rodriguez's "Immediate Working Memory" fell within the borderline range, indicating Low Average ability, which was indicative of a global impairment memory.  *Id.*  Additionally, his Auditory Immediate score indicated an extremely low ability in learning, retaining and recalling auditory information.  *Id.*  Dr. Clements stated that Rodriguez struggles to learn, recall, and retain short-term and new information. *Id.*  Rodriguez's diagnosis was — Axis I: Cognitive Disorder NOS (294.9); Axis II: no diagnosis; Axis III: Grand mal seizures; Axis IV: lack of finances; Axis V: present GAF = 50.[5]  *Id.*  Rodriguez reported occasional use of alcohol.  R. 186.

On February 18, 2003, the Social Security Administration sent Rodriguez for a physical evaluation by Charles Grant, M.D.  R. 189-192.  During the evaluation, Rodriguez informed the doctor that his main problems were a seizure disorder, memory loss, and chronic dislocation of the left shoulder.  R. 189.  Rodriguez reported that he drinks one beer per week.  R. 190.  Dr. Grant noted during the physical examination that abduction and forward flexion of the left shoulder to more than

---

[5]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  DSM-IV at 32.  A GAF code of 41 - 50 indicates serious symptoms, or serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job).  DSM-IV at 32.

90° caused the humerus head to start to slip from the socket.  R. 191.  X-rays of the left shoulder revealed mild to moderate arthritic changes.  *Id*.  Dr. Grant's functional assessment of Rodriguez was decreased range of motion of the left shoulder.  R. 192.  All other functions were normal, except that Rodriguez may have one seizure every three to four months.  *Id*.

On February 19, 2003, Michael H. Zelenka, Ph.D., conducted a Mental Residual Functional Capacity Assessment.  R. 194-210.  Dr. Zelenka opined that, although Rodriguez has a cognitive disorder (R. 199), he has no limitations in his activities of daily living, no limitations of his ability to maintain social functioning, and moderate limitations in his ability to maintain concentration, persistence or pace.  R. 208.  Dr. Zelenka noted that Rodriguez had the mental ability to carry out simple instructions and relate appropriately to others in a routine work setting.  R. 196.

On June 9, 2003, Rodriguez saw Dr. Shanmugham for a follow up.  R. 100.  Rodriguez had suffered two seizures in his sleep since his last visit.  *Id*.  Dr. Shanmugham's diagnosis remained partial complex seizures.  *Id*.  Rodriguez stated he was unable to lift heavy objects with his hands due to left shoulder pain; Dr. Shanmugham recommended that he see an orthopedic surgeon.  *Id*. Rodriguez also complained of memory loss, and he could only remember one out of three items on the memory status evaluation. R. 100.

On June 13, 2003, Jeffrey L. Prickett, Psy.D. conducted a Mental Residual Functional Capacity Assessment.  R. 229-46.  Dr. Prickett opined that Rodriguez has a cognitive disorder that results in moderate limitations in his activities of daily living, no limitations in his ability to maintain social functioning, moderate limitations in his ability to maintain concentration, persistence or pace,  and

no episodes of decompensation.  R. 234, 243.  Prickett opined that Rodriguez should be able to work a job in the national economy that is simple and not complex.  R. 231.

On October 29, 2003, Rodriguez sought treatment for his Hepatitis C infection. R. 265. Dr. Edwin DeJesus indicated that the Hepatitis was mild, but progressing and further treatment should be considered.  R. 266.  However, he was concerned that treatment for the Hepatitis would further precipitate the seizure disorder.  *Id*.  Rodriguez reported that he used alcohol occasionally.  R. 265.

On January 12, 2004, Rodriguez saw Dr. DeJesus for a follow up visit.  R. 259-261. Rodriguez reported that he continues to drink on a regular basis every week, but that he has few drinks.  R. 259.  Rodriguez also reported that he had experienced another seizure two weeks prior to his visit, but did not go to the hospital.  *Id*.  Dr. DeJesus counseled Rodriguez regarding the importance of alcohol abstinence and the issues with the progression of his disease.  R. 260.  When Rodriguez saw Dr. DeJesus on April 19, 2004, Rodriguez admitted that he was continuing to drink and that he had a few seizures since his last visit, but otherwise he felt well.  R. 257.

On July 6, 2004, Dr. Shanmugham completed a residual functional capacity questionnaire indicating the he treated Rodriguez for partial complex seizures, a cerebral contusion and memory loss.  R. 247.  Dr. Shanmugham stated that Rodriguez had, on the average, one seizure per month. *Id*. Thereafter, according to Dr. Shanmugham, Rodriguez would be unable to function for up to two days after a seizure.  R. 248.  Dr. Shanmugham also indicated that Rodriguez had associated mental problems of a short attention span and memory problems.  R. 249.  Dr. Shanmugham denied that Rodriguez suffered from ethanol abuse.  *Id*.  Dr. Shanmugham opined that Rodriguez would be

incapable of even a low stress job and, would be absent from work more than four days per month. R. 250.

On August 6, 2004, Rodriguez saw James P. Ryan, IV, M.D., an orthopedic surgeon, for the trouble he had been experiencing with this left shoulder.  R. 251.  Rodriguez reported that he has trouble lifting and bending his arm and that he cannot put it behind his back or over his neck.  *Id.* During the examination, Dr. Ryan noted that Rodriguez had marked crepitus and grinding in the left shoulder and a limited range of motion.  *Id.* He can only flex to 125 ° and abduct to 100°.  *Id.*  Internal rotation showed that he was unable to reach midline, though he had good external rotation and his rotator cuff strength appeared to be fair.  *Id.*  An x-ray revealed extensive arthritic changes with joint space narrowing and hypertrophic spurring.  *Id.*  Dr. Ryan diagnosed chronic left rotator cuff arthropathy that may eventually require shoulder replacement.  *Id.*  In the meantime, he prescribed anti-inflammatory medication.  *Id.*

Evidence presented to the Appeals Council consisted of a letter from Dr. Shanmugham dated February 10, 2005.  R. 313.  Dr. Shanmugham opined that Rodriguez's seizures were due to a head injury he suffered while he was young. R. 313.  Dr. Shanmugham noted that Rodriguez had "recently" stopped drinking any alcohol, but continued to have seizures in spite of this and in spite of his medications. *Id.*  Dr. Shanmugham did not state when Rodriguez stopped consuming alcohol.  The doctor also noted that Rodriguez's memory was poor.  *Id.*  Finally, Dr. Shanmugham stated that Rodriguez was unable to work and unable to drive due to his seizures.  *Id.*

**B.     THE ANALYSIS**

**1.     No Error in Determining Rodriguez Had RFC for Light Work**

Rodriguez contends the ALJ erred in determining Rodriguez had the RFC for light work when Rodriguez's treating physician, Dr. Shanmugham, opined that Rodriguez was unable to work. Plaintiff's issue contains two components: (1) whether the ALJ properly rejected the opinion of the treating physician, and (2) whether substantial evidence supports the ALJ's RFC determination. Finally, Rodriguez argued that additional evidence submitted to the AC supported a finding of disability.

**a.     The ALJ Did Not Err in Rejecting Dr. Shanmugham's Opinion**

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. The ALJ, however, may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.

In this case, Dr. Shanmugham opined in December 2002 that Rodriguez's seizures affect his motor abilities and that his disability is permanent. R. 184. Dr. Shanmugham also opined in July

2004 that the claimant has partial complex seizures, averaging once per month, that occur mostly during his sleep and that result in postictal manifestations of confusion, exhaustion and severe headaches. R. 247-50.  Dr. Shanmugham further opined that the claimant is incapable of low-stress jobs due to his seizures.  *Id*.  He also noted that Rodriguez does not suffer from alcohol related seizures despite Rodriguez's admission that he suffered seizures following drinking alcohol.  *Id*.  The ALJ accorded little weight to these opinions due to their inconsistency with the evidence of record, including the claimant's own admissions and Dr. Shanmugham's statements that management of the seizure activity is complicated by claimant's continued drinking.  R. 17.

Rodriguez's argument that the ALJ erred focuses specifically on the rejection of Dr. Shanmugham's opinion that the seizures were unrelated to alcohol.  The record is replete is Rodriguez's statements that he continued to consume alcohol despite advice from Dr. Shanmugham and Dr. DeJesus to abstain from alcohol use.  Further, Dr. Shanmugham's treatment notes repeatedly stated that alcohol use was a causative factor in Rodriguez's seizures.  The ALJ did not err in determining that the evidence was inconsistent with Dr. Shanmugham's opinion.[6]

Nor did the Commissioner err in failing to reverse or remand based on the additional evidence.  Dr. Shanmugham's letter that Rodriguez had stopped drinking and still experienced seizures did not provide the date when Rodriguez stopped drinking or any information about the frequency or extent

---

[6] Although not specifically argued by Rodriguez, the Court finds no error in the ALJ's rejection of Dr. Shanmugham's opinions that Rodriguez's motor skills were impaired.  Repeated examinations by Shanmugham revealed normal muscle strength in all four extremities, normal gait was normal, no signs of ataxia, deep tendon reflexes of 2+ that were symmetrical, and plantar response that was flexor bilaterally.  See R. 101, 103, 104.  Further, Dr. Shanmugham's opinion that Rodriguez's motor skills were impaired failed to quantify the motor deficits in degrees or the extent in which it has resulted in a sustained disturbance of gait, station and/or fine or gross movement.  R. 184.  This opinion was both conclusory and inconsistent with the evidence of record.  To the extent that Dr. Shanmugham also opined that Rodriguez was incapable of even low stress jobs, there is no evidence that stress was a precipitating factor in Rodriguez's seizures.

of the seizures after Rodriguez stopped consuming alcohol.  The additional evidence not only was conclusory, but it was inconsistent with Dr. Shanmugham's repeated statements that alcohol consumption affected Rodriguez's condition.  The Appeals Council could have properly decided that the new evidence did not provide a basis for changing the ALJ's decision.

In addition to the opinions specifically rejected by the ALJ, Rodriguez claimed the ALJ erred in implicitly rejecting Dr. Shanmugham's opinion that Rodriguez had poor memory.  Docket 20 at 11.  The basis for rejecting Dr. Shanmugham's opinion appears to be Rodriguez's failure to comply with his physicians' advice to abstain from alcohol, which caused the seizures and resultant memory problems.  R. 19.  As stated above, Dr. Shanmugham's opinion that Rodriguez's seizures were unrelated to alcohol use was inconsistent with the evidence.  Further, the ALJ's failure to give weight to Dr. Shanmugham's statements that Rodriguez's memory was "poor" also is supported by Dr. Shanmugham's inconsistent conclusion that Rodriguez's memory problems were "mild" and that no change in medication was warranted.  R. 101-04.

For all of these reasons, there was no error in giving only little weight to Dr. Shanmugham's opinions.

b.   **Substantial Evidence Supports the RFC Finding**

The ALJ found that Rodriguez retained the RFC to lift and carry no more than twenty pounds occasionally and ten pounds frequently, sit for about two hours per eight-hour workday, stand and walk for about six hours per eight-hour workday, with occasional limitations of his ability to push and pull with the upper left extremity, an ability to understand, remember and carry out only simple instructions, and a need to avoid all exposure to unprotected heights and dangerous moving

machinery.  R. 17-18.  Rodriguez argues the ALJ erred because Dr. Clements, whose opinion the ALJ accorded "great weight," opined that Rodriguez had a cognitive disorder and had difficulty with learning, recalling and retaining short-term and new information.  R. 15.  Rodriguez also argues that his GAF score of 50 indicates he is unable to work.  Docket 20 at 12.

Rodriguez acknowledges that Dr. Clements did not indicate to what degree Rodriguez's cognitive disorder would impact his ability to work.  Docket 20 at 12.  Further with respect to Rodriguez's GAF score, the Commissioner argues that his score reflected only his performance on that particular day and does not necessarily indicate that he is disabled within the meaning of the Act.  The Court agrees that without other GAF scores to establish a history of Rodriguez's functional level (or his highest GAF during the year), this single score does not show that Rodriguez is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment expected to last twelve or more continuous months. *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.

A State Agency psychologist, Michael H. Zelenka, Ph.D., opined that although Rodriguez has a cognitive disorder (R. 199), he had no limitations in his activities of daily living, no limitations of his ability to maintain social functioning, and moderate limitations in his ability to maintain concentration, persistence or pace.  R. 208.  Dr. Zelenka noted that Rodriguez had the mental ability to carry out simple instructions and relate appropriately to others in a routine work setting.  R. 196. The ALJ gave great weight to Dr. Zelenka's opinion due to its consistency with the evidence of record, including Rodriguez's self-reported activities of daily living.  R. 16.

Jeffrey L. Prickett, Psy.D. also conducted a mental RFC assessment, finding that Rodriguez has a cognitive disorder that results in moderate limitations in his activities of daily living, no limitations in his ability to maintain social functioning, moderate limitations in his ability to maintain concentration, persistence or pace, and with no episodes of decompensation. R. 234, 243. Prickett opined that Rodriguez should be able to work a job in the national economy that is simple and not complex. R. 231. Rodriguez points out that the ALJ made inconsistent statements regarding the weight to be given to Prickett's opinion. R. 16 (giving little weight) and R. 17 (giving great weight).

Even if the Court were to exclude Prickett's opinion because of the ALJ's inconsistent statements about the weight to be given to this evidence, Dr. Zelenka's opinion provides substantial evidence to support the ALJ's determination of Rodriguez's mental RFC. Further, Dr. Clements' opinion is not inconsistent. She never expressed any work limitation resulting from Rodriguez's memory problems.

### 2.     The ALJ Committed Harmless Error in Evaluating Rodriguez's Pain

Rodriguez argues that the ALJ erred in applying the three-part pain standard to assess Rodriguez's pain. The Eleventh Circuit's three-part "pain standard" requires: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

Rodriguez argues that Dr. Ryan's diagnosis of arthritis in his left shoulder is evidence of his underlying medical condition. Docket 20 at 18; R. 251. Rodriguez also argues that, because he may

-34-

eventually require shoulder replacement, the severity of his condition should reasonably be expected to give rise to the alleged pain.

The problem with Rodriguez's argument is that the record does not reflect the severity of pain he allegedly suffered. Rodriguez is right-handed. R. 318. Further, the evidence showed that Rodriguez experienced left shoulder pain only when putting his arm in certain positions or laying down. R. 251. Rodriguez was only prescribed anti-inflammatory medication and not pain medication. *Id*. Rodriguez was able to participate in numerous activities, including light housekeeping, washing the car, raking the yard, playing basketball at the park, and socializing. R. 187. The record also reveals that he read sports magazines, washed dishes, vacuumed, washed the car, and cleaned his room. R. 58. His wife also stated that Rodriguez watches television, takes care of his fish, and rakes outside when she is at home. *Id*.

While it is true the ALJ did not apply the three-part pain standard, any error was harmless. The courts may decline to reverse and remand on procedural grounds when it is clear that the procedural error did not compromise the decision-making process. *Ware v. Schweiker,* 651 F.2d 408, 414 (5th Cir. 1981)[7] (ALJ's failure to warn Social Security claimant she bore the burden of proof and failure to probe fully the job duties of a nurse's aide were harmless error not requiring remand when there was no showing of prejudice); *Wright v. Barnhart*, 153 Fed.Appx. 678, 684 (11th Cir. 2005) (unpublished) (an incorrect application of the Social Security regulations resulted in harmless error because a correct application would not contradict the ALJ's ultimate findings). The law does not require this Court to reverse and remand for technical failings that do not influence the outcome. This principle is

---

[7] The *Ware* case was decided on July 24, 1981, making it binding precedent pursuant to *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

especially important in the Social Security context where the sheer volume of cases requires that the courts not further burden the Social Security Administration with the remand of futile claims. *See Alejandro*, 291 F. Supp. 2d at 515-16 (citing cases). The ALJ considered and accounted for Rodriguez's pain when he limited Rodriguez to light work.

### 3.   Failure to Obtain an Opinion From a Vocational Expert

The ALJ concluded that, based on Rodriguez's exertional capacity to perform substantially all of the requirements of light work, and considering his age, education, and work experience, a finding of "not disabled" was supported by application of Medical-Vocational Rule 202.18. R. 19. Rodriguez argues the ALJ erred in not obtaining evidence from a VE because Rodriguez suffered from non-exertional impairments. Rodriguez argued that he had non-exertional impairments of pain and memory problems. Docket 20 at 16.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without *significant* non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).

An impairment is "not severe" if it does not "significantly limit" a claimant's physical or mental ability to perform "basic work activities." 20 C.F.R. § 404.1521(a). "Basic work activities"

is defined as the ability and aptitude to do most jobs, an example of which is the ability to understand, carry out and remember simple instructions.  20 C.F.R. § 404.1521(b).

In this case, the ALJ determined that Rodriguez's exertional and non-exertional impairments were "severe" within the meaning of the Regulations, but not severe enough to meet or medically equal the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 16.  As discussed above, the ALJ did not find Rodriguez's pain to be significant.  The ALJ also specifically found that Rodriguez was able to understand , remember and carry out simple instructions. R. 17-18.  Based on these findings, the ALJ determined that Rodriguez did not have a significant non-exertional impairment.  The ALJ did not err in failing to obtain testimony from a VE and relying exclusively on the grids to determine disability.

**VI.**   **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk is directed to enter a separate judgment in favor of Defendant and close the case.

**DONE** and **ORDERED** in Orlando, Florida on September 14, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Danielle F. Forte, Assistant Regional Counsel
Office of the General Counsel, Region IV

-37-

Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL               33602

The Honorable Apolo Garcia
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL             32817